UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| RAY F. GARMAN, III | : | |
| Debtor | : | Bankruptcy No. 05-37483bf |

.................................................

MEMORANDUM

.................................................

Presently before me is the motion of the chapter 7 trustee, Gary F. Seitz, Esq., to enforce a settlement agreement entered into in March 2007 with, inter alia, Ms. Mia Mayer.  Upon such enforcement, the trustee seeks to "preclude" Ms. Mayer from receiving any distribution on her asserted priority claim and to strike Ms. Mayer's objection to the trustee's pending final application for compensation under 11 U.S.C. §§ 326 and 330.  The trustee's enforcement motion is "joined" by Ms. Waverly Deans, the other party to the March 2007 settlement agreement.[1]  The trustee's motion also has the support of an unsecured creditor, Weir & Partners, LLP, as well as the debtor.

Ms. Mayer opposes the trustee's present motion.  She contends that she is in full compliance with the terms of the March 2007 settlement, in that her assertion of a priority claim as well as her objection to the trustee's compensation request do not contradict its express terms.  Therefore, she maintains that the trustee's enforcement motion must be denied.

---

[1] I view Ms. Dean's joinder pleading as supportive of the trustee's requested relief, rather than seeking actual joinder under Fed. R. Bankr. P. 7019 or 7020.  Neither procedural rule is automatically incorporated into contested matters such as this.  See Fed. R. Bankr. P. 9014(c).

An evidentiary hearing was held, during which the parties offered testimony regarding the negotiations surrounding the settlement agreement to the extent its terms are ambiguous.[2]  They also agreed that I could take judicial notice of my decision approving the March 2007 settlement agreement, docket entries, certain orders entered in this chapter 7 case, and the proof of claim filed by Ms. Mayer.  I shall also take judicial notice of the proof of claim filed by Ms. Deans.

I.

A.

For purposes of this contested matter, the following facts were proven, as detailed in narrative format.

Mr. Garman filed a voluntary petition in bankruptcy under chapter 7 on October 14, 2005.  At the time of his bankruptcy filing, he was involved in a long-pending divorce proceeding in state court concerning his former spouse, Ms. Mia Mayer (a/k/a Mia Mayer Garman).  Ex. T-1, ¶ 2.  In connection with that divorce litigation, Ms. Mayer asserted, inter alia, that Mr. Garman misused her individual as well as their marital property for his own purposes, and sought recovery against him for this misuse.  The state court agreed, awarding Ms. Mayer certain property titled in the name of  Mr. Garman. Ex. T-1, ¶ 3.

---

[2]Although both the trustee as well as Ms. Mayer argue that the relevant terms of the settlement agreement are unambiguous.

2

While that divorce proceeding was pending, Mr. Garman entered into a relationship with Ms. Waverly Deans. Ex. T-1, ¶ 6. During the divorce proceeding, Ms. Mayer learned that Ms. Deans held title to a certain asset, and Ms. Mayer contended that this asset should be transferred to her. Ex. T-1, ¶¶ 4, 5, and 7. The Pennsylvania Supreme Court vacated various trial court orders directed against Ms. Deans, based upon lack of service and due process. See Mayer v. Garman, 590 Pa. 268 (2006). Thereafter, in August 2006, Ms. Mayer filed a civil action in state court against Mr. Garman and Ms. Deans. This lawsuit sought to recover the proceeds of sale of that asset. Ex. T-1, ¶ 12.

The August 2006 lawsuit by Ms. Mayer against Mr. Garman and Ms. Deans was removed to this court under 28 U.S.C. § 1452(a) and docketed at Adv. No. 06-0608. Ex. T-1, ¶ 15. The chapter 7 trustee was then added as a plaintiff in that litigation. Ex. T-1, ¶¶ 13-14. This adversary proceeding concerned the disputed ownership of the proceeds of the sale by Ms. Deans in April 2006 of an interest in PMA Capital Management Ltd., which interest was held in the name of Ms. Deans. Ex. T-1, ¶ 8. Upon the sale of this interest, Ms. Deans had received approximately $7.4 million, of which about $7 million in cash or cash equivalents remained in her possession or control as of March 2007. Ex. T-1, ¶¶ 8, 15.

In response to Ms. Mayer's complaint, Ms. Deans asserted that the PMA sale proceeds belonged to her. Ms. Mayer countered that the PMA sale proceeds should be considered the property of Mr. Garman that had been titled to Ms. Deans improperly, and, as such, had been awarded to Ms. Mayer by the state court. The bankruptcy trustee took the position that the PMA sale proceeds actually belonged to Mr. Garman, had not

3

been awarded to Ms. Mayer by the state court, and so were property of the bankruptcy estate and thus available for distribution in this chapter 7 case.

Although Ms. Mayer claimed ownership of the PMA sale proceeds, she also asserted that she was a creditor of Mr. Garman. Her attorney signed and filed a proof of claim on her behalf, dated March 7, 2006, and docketed on the claims register as claim #5. In this claim, her attorney averred that Ms. Mayer held an unsecured claim in the amount of $500,000, a secured claim in the amount of $15,300,000 and a priority claim in the amount of $15,300,000. The total amount claimed as owing was, however, $15,800,000.

These claims were allegedly based upon "Domestic Support Obligations" dated July 23, 2003 and June 8, 2004, and the proof of claim checked off a priority obligation under section 507(a)(1)(A) or (B). Ms. Mayer's proof of claim also included a cramped handwritten statement that appears to read: "All property owned in debtor's name belongs to creditor Mia Mayer. To the extent the debtor's property is not owned by creditor Mayer, creditor Mayer has scheduled priority interest in the property." No party in interest thereafter objected to this claim; nor has it been withdrawn.

The chapter 7 trustee conducted a meeting of creditors under section 341. Ms. Mayer, through her counsel, was present at that creditors' meeting and provided the trustee with information concerning the possible existence of non-exempt assets. Thereafter, the trustee filed an application seeking court approval to engage bankruptcy counsel in September 2006.

The bankruptcy trustee sought to engage counsel on a contingency basis "of forty percent (40%) of net recovery, after reimbursement of necessary expenses." Docket

4

entry #56.  After comment from Ms. Mayer's counsel at a status hearing, an order was

entered without opposition permitting the trustee to engage the law firm of Fox

Rothschild LLP "to be compensated on a contingency fee of a floor amount of thirty

percent (30%) and a maximum amount of forty percent (40%) of net recovery of funds

collected, after reimbursement of necessary expenses."  See docket entry #61.

After the trustee engaged bankruptcy counsel, he and Ms. Mayer sought to

restrict Ms. Deans' use of the remaining PMA sale proceeds in her possession.  Various

injunction hearings were held on that issue.  Although Ms. Mayer and the trustee were

both seeking restrictions against Ms. Deans, they were not in accord regarding the rightful

ownership of the PMA sale proceeds.


B.


Against this backdrop, the trustee, Ms. Mayer and Ms. Deans entered into a

settlement agreement to resolve their ownership dispute over the PMA sale proceeds held

by Ms. Deans.  That agreement, exhibit T-1, was approved by this court on March 27,

2007, for reasons stated in a lengthy memorandum.

After recitation of certain background facts, the settlement agreement

contained the following relevant provisions, all found after recital paragraph 17:

> a. Immediately upon approval by the Bankruptcy Court of this
> Settlement Agreement, Deans shall cause all remaining
> Proceeds [i.e., approximately $7 million] to be wired to the
> Trustee (the "Settlement Payment") to be distributed as set
> forth herein.
>
> b. Immediately upon the Order approving this Settlement
> Agreement becoming a final order, and upon the funds

5

clearing the Trustee's account, the Trustee shall distribute
$1,125,000.00 to Deans. . . .

c. Immediately upon the Order approving this Settlement
Agreement becoming a final order, and upon the funds
clearing the Trustee's account, the Trustee shall distribute
$3,875,000,00 [sic] to Mayer as an equitable distribution
pursuant to paragraph 5 of the June 2004 [state court] Order.

d. The Trustee shall prepare and file all tax returns required to
be filed with respect to the liquidation of the PMA asset and
will utilize the Settlement Payment to pay any and all taxes
due with respect to the liquidation of the PMA asset,
estimated to be $969,000.00.

e. Fox Rothschild LLP ('Fox") , counsel for the Debtor [sic],
shall be entitled to receive a fee equal to 30-40% of the
Settlement Payment pursuant to the provisions of the
Employment Order dated October 18, 2006.  It is agreed,
however, that Fox shall accept as a fee an amount not to
exceed $500,000.00.

f. The Trustee shall be entitled to his statutory commission but
has agreed that in no event will he receive more than
$175,000.00 commission related to the recovery of the
Settlement Payment.

g. The limits on the Trustee's counsel fees and on the
Trustee's commissions as set forth herein shall apply only to
the recovery of the Settlement Payment and not to any other
recovery of assets in this bankruptcy case.
                              ***
i. All remaining funds shall be distributed by the Trustee in
accordance with the distribution scheme set forth in the
Bankruptcy Code.  For the purpose of distributions to
unsecured general creditors, Mayer shall be allowed a general
unsecured claim against the Debtor's estate in the amount of
$7,500,000.00 on account of her prepetition claim and Deans
shall be entitled to a assert an unsecured prepetition claim of
$2,500,00.00.  The Trustee agrees not to object to the
allowance of the proofs of claim of Deans and Mayer.  Both
Deans and Mayer shall be entitled to participate pro rata in
any distribution to unsecured creditors of the Debtor's estate,
to the extent of their allowed general unsecured claims as set
forth herein, after holders of other Allowed Unsecured Claims
receive a distribution of ten (10%) per cent.  The amount of

6

the allowed claims set forth herein shall apply only to the
distribution of the remaining portion of the Settlement
Payment and not to any other assets that may be recovered by
the Trustee.

\*\*\*

q. This Settlement Agreement contains the entire agreement
between [sic] the parties and may only be amended in writing
executed by both [sic] parties hereto and approved by the
Bankruptcy Court.

\*\*\*

u. This Settlement Agreement shall be construed without
regard to any presumption or other rule requiring construction
against the party causing the document to be drafted.  Each
party warrants that it has been represented and advised by
counsel or has had full opportunity to be represented and
advised by counsel with respect to this Settlement Agreement
and all matters covered by it.

v. This Settlement Agreement shall be interpreted and
construed in accordance with the provisions of the
Bankruptcy Code and, where not inconsistent, the laws of the
Commonwealth of Pennsylvania, without regard to the
Commonwealth's rules regarding conflict of laws.

Ex. T-1.

After court approval of this settlement agreement, Ms. Deans transferred

the roughly $7 million settlement payment to the trustee as required by paragraph (a).

The trustee paid approximately $1 million tax liability on the sale proceeds and then

distributed $1,125,000 to Ms. Deans and $3,875,000 to Ms. Mayer.  Ms. Deans, through

her attorney, also filed an unsecured proof of claim in the amount of $2,500,000 dated

April 16, 2007 and docketed as claim #6.  This claim states that it is based upon the

March 27, 2007 settlement agreement.

The docket entries also disclose that in July 2007, trustee's counsel was awarded $500,000 in attorneys' fees.[3]  Docket entry #98.  The chapter 7 trustee also sought interim compensation in May 2007, which request was granted without opposition in July 2007.  The trustee was allowed an interim commission in the amount of $90,115.00 and reimbursement of expenses totaling $122.48.  Docket entry #99.  After payment of certain other administrative expenses, the trustee has about $368,000 remaining for distribution.  See Formerly Proposed Final Report, exhibit C.

## C.

As expressed in the settlement agreement itself, Ms. Mayer, Ms. Deans and the bankruptcy trustee were all represented by counsel who negotiated its terms.[4]  Various discussions took place and draft versions of the agreement were circulated among counsel.

The parties do not dispute that an initial settlement discussion considered payments to Ms. Mayer of more than $4 million and to Ms. Deans of more than $1.2 million from the PMA sale proceeds.  Upon hearing testimony about those negotiations, I find that trustee's counsel was insistent that some portion of the settlement proceeds be paid to general unsecured creditors as well as administrative creditors.  Ms. Dean's counsel concurred in that position, and I also find that Ms. Mayer's counsel was well

---

[3]An objection by Ms. Mayer to counsel's fee application was withdrawn.  See docket entry #89.

[4]Indeed, Ms. Mayer was represented by the law firm handling her state court divorce litigation, as well as a law firm specializing in bankruptcy law.

8

aware of this intention.  Various provisions of the settlement agreement, including the distribution figures to Ms. Deans and Ms. Mayer, were intended by the trustee and Ms. Deans to reflect those concerns.

Similarly, the provisions of settlement paragraphs (e) and (f), quoted earlier, specifying payments to the trustee and trustee's counsel, were also negotiated among the parties and contained ceilings that, in part, were designed to insure some distribution to general unsecured creditors.  Furthermore, the subordination provisions of paragraph (i) also reflected that intention.  The allowed unsecured claim amounts in favor of Ms. Deans and Ms. Mayer found in paragraph (i) were the product of this overall compromise.

Ms. Mayer's counsel acknowledges that he knew at the time the settlement was reached that the trustee and his counsel believed that the entire PMA settlement proceeds would be treated as though they were property of the bankruptcy estate. Although Ms. Mayer's counsel disagreed, he never expressed that disagreement to the other attorneys.

I further find that Ms. Mayer did not raise during settlement negotiations the $15,300,000 priority component asserted in her proof of claim.  That priority claim was never discussed by any of the parties to the agreement.  Nor was there any discussion that Ms. Mayer was waiving her priority claim.

Finally, I find that Ms. Mayer believed and, through her attorney, raised to the trustee and Ms. Deans her expectation that the trustee would recover substantial additional assets from Mr. Garman that would be distributed to creditors.  Unfortunately for Mr. Garman's creditors, the trustee only recovered a very modest amount in addition to the disputed PMA sale proceeds.  See docket entries ##44, 49 (sale of vehicles).

9

II.

The instant dispute arises from the trustee's proposed report of final distribution to creditors and his application for final compensation in the amount of $175,000 (less the interim allowance he already received).  This proposed final distribution of approximately $368,000 contained no provision for payment to Ms. Mayer of any priority claim.[5]

Ms. Mayer objected to the proposed final distribution as failing to provide any payment to her as a priority creditor, as required by section 726(a)(1).  She also objected to the trustee's final fee application and thus to the proposed distribution to the trustee of an additional $86,476.90 in compensation.  As to the latter, Ms. Mayer asserted that the trustee is wrongfully including as estate property the sums distributed by him to Ms. Mayer and Ms. Deans under the March 2007 settlement agreement.  She considers those payments as representing "property returned to its rightful owner(s) that was not property of the estate."  Thus, in Ms. Mayer's opinion, the trustee is seeking compensation beyond the ceiling established by section 326(a) of the Bankruptcy Code. In addition, she maintains that the amount sought by the trustee is not fair and reasonable, as required by section 330(a).

For reasons unrelated to Ms. Mayer's objections, the trustee withdrew his proposed final report, but not his application for final compensation.  His present enforcement motion, however, does not seek any final award of compensation.  Instead,

---

[5]The report does, however, provide a distribution to Ms. Mayer on her unsecured claim as provided by paragraph (i) of the settlement agreement.

10

he seeks an interpretation of the settlement agreement: (1) that Ms. Mayer is not entitled

to payment on her priority claim from the funds remaining in his possession; and (2) that

Ms. Mayer is not entitled to object to the trustee's final application for compensation.

Both contentions are derived from the trustee's construction of the March 2007 settlement

agreement.  Ms. Deans, the debtor and Weir & Partners, LLP support the trustee's

position on both issues.

      Although the trustee has withdrawn his request to approve his final

distribution report, I conclude that the instant contested matter is ripe for adjudication on

these issues.  First, the trustee's final compensation request and Ms. Mayer's objection

thereto have not been withdrawn.  Ms. Mayer's right to raise her objection requires an

interpretation of the settlement agreement.  Second, the trustee's instant motion, insofar

as prospective final distribution is concerned, may be analogized to a request for a

declaratory judgment.  Such a request is considered ripe based upon "(1) the adversity of

the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the

judgment."  Pic-A-State Pa., Inc. v. Reno, 76 F.3d 1294, 1298 (3d Cir. 1996); see, e.g.,

NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 342 (3d Cir. 2001).[6]

      Here, resolution of this dispute would be conclusive as to both the right of

Ms. Mayer to object to the trustee's final application for compensation and to as certain

aspects of his intended final distribution report.  Moreover, the evidence is fully

---

[6]Under Federal Rule of Bankruptcy Procedure 7001, a declaratory judgment action
should be brought via an adversary proceeding.  However, such a requirement can be waived
where, as here, all parties had adequate notice and opportunity to participate in the hearing and
no procedural objection is raised.  See In re Wegscheid, 361 B.R. 144, 146 n.4 (Bankr. D. Ariz.
2007); see generally In re Cannonsburg Environmental Associates, Ltd., 72 F.3d 1260, 1265 (6th
Cir. 1996); Matter of Village Mobile Homes, Inc., 947 F.2d 1282, 1283 (5th Cir. 1991); In re
Orfa Corp., 170 B.R. 257, 275 (E.D. Pa. 1994).

developed and involves no contingent or uncertain events.  Its resolution will greatly

assist in the final administration of this long-standing chapter 7 case, with creditors

receiving the distributions to which they are entitled.  Thus, there is a substantial

controversy among parties having adverse legal interests of sufficient immediacy and

reality to warrant the consideration of a declaratory judgment.  See Maryland Casualty

Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941); RLI Ins. Co. v. Regulus Group,

LLC, 2005 WL 1388630 (E.D. Pa. 2005).


III.


Consistent with the terms of the settlement agreement, the parties

acknowledge that Pennsylvania law primarily governs the resolution of their dispute.  I

turn to contract interpretation principles as enunciated by Pennsylvania courts (and

followed when relevant by federal courts), as settlement agreements are considered to be

contracts.  See, e.g., Consolidated Rail Corp. v. Portlight, Inc., 188 F.3d 93, 96 (3d Cir.

1999); Mastroni-Mucker v. Allstate Ins. Co., 2009 WL 1497107, at *7 (Pa. Super. 2009)

("The enforceability of settlement agreements is determined according to principles of

contract law."); Thompson v. T.J. Whipple Const. Co., 2009 WL 807467, at *3 (Pa.

Super. 2009) ("Settlement agreements 'are regarded as contracts and must be considered

pursuant to general rules of contract interpretation.'") (quoting Friia v. Friia, 780 A.2d

664, 668 (Pa. Super. 2001)).

The basic principles of contract interpretation under Pennyslvania law are

well-understood.

12

"The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties." Murphy v. Duquesne Univ. of the Holy Ghost, 565 Pa. 571, 590-91 (2001), see also Robert F. Felte, Inc. v. White, 451 Pa. 137, 143 (1973). The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous. Steuart v. McChesney, 498 Pa. 45, 48-49 (1982). However, a contract is ambiguous if it is capable of being understood in more than one sense. Hutchinson v. Sunbeam Coal Corp., 513 Pa. 192, 201 (1986); see also Kripp v. Kripp, 578 Pa. 82, 91 (2004). A court can find a contract ambiguous if a provision "could arguably be interpreted" as either party urges. Hutchinson, 513 Pa. at 201. A contractual term is not ambiguous, however, if the term can only mean one thing. Kripp, 578 Pa. at 91.

As the Third Circuit Court of Appeals has explained:

> Pennsylvania courts apply the "plain meaning rule" of interpretation of contracts which assumes that the intent of the parties to an instrument is "embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." County of Dauphin v. Fidelity & Deposit Co., 770 F. Supp. 248, 251 (M.D. Pa.) (quotation omitted), aff'd, 937 F.2d 596 (3d Cir.1991). Nevertheless, a determination whether the language of an agreement is unambiguous may not be possible without examining the context in which the agreement arose. Steuart v. McChesney, 498 Pa. 45, 444 A.2d 659, 662 (1982). Thus, a court is not always confined to the four corners of the written document in determining whether ambiguity exists. Mellon, 619 F.2d at 1011. Rather, the judge must "consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." Id.

Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994); see also Friia v. Friia, 780 A.2d 664, 668 (Pa. Super. 2001):

13

"The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties." Amerikohl Mining, 727 A.2d at 1182. Thus, "the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." Charles D. Stein Revocable Trust v. General Felt Industries, Inc., 749 A.2d 978, 980 (Pa. Super. 2000). "If the language appearing in the written agreement is clear and unambiguous, the parties' intent must be discerned solely from the plain meaning of the words used." Id. Contractual language is ambiguous only if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense." Purdy v. Purdy, 715 A.2d 473, 475 (Pa. Super.1998). "A contract is not rendered ambiguous by the mere fact that the parties do not agree upon its proper construction." Riccio v. American Republic Ins. Co., 453 Pa. Super. 364, 683 A.2d 1226, 1233 (1996). Moreover, the court may not ignore otherwise clear language merely because one of the parties did not anticipate related complications prior to performance. See In re St. Mary Hospital, 157 B.R. 235, 238 (E.D. Pa.1993).

In addition, "[c]ontracts are best read as a whole and 'clauses seemingly in conflict [should be] construed, if possible, as consistent with one another. Terms in one section of the contract should not be interpreted in a manner which nullifies other terms.'" Universal Underwriters Ins. Co. v. A. Richard Kacin, Inc., 916 A.2d 686, 692 (Pa. Super. 2007) (quoting AK Steel Corp. v. Viacom, Inc., 835 A.2d 820, 824 (Pa. Super. 2003) (internal quotation marks and citation omitted)). The Third Circuit Court of Appeals observed in this regard:

> In Pennsylvania, [c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. Courts assume that a contract's language is chosen carefully and that the parties are mindful of the meaning of the language used. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

14

> Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped,
> 886 A.2d 706, 711 (Pa. Cmwlth. 2005) (internal citations and
> quotation marks omitted).
>
> A contract is ambiguous if it is reasonably susceptible of
> different constructions and capable of being understood in
> more than one sense.  The court, as a matter of law,
> determines the existence of an ambiguity and interprets the
> contract whereas the resolution of conflicting parol evidence
> relevant to what the parties intended by the ambiguous
> provision is for the trier of fact.
>
> Hutchison v. Sunbeam Coal Corp., 513 Pa. 192, 519 A.2d
> 385, 390 (Pa. 1986) (internal citations omitted).  However,
> "[a]n appellate court may draw its own inferences and arrive
> at its own conclusions when a finding of fact is simply a
> deduction from other facts and the ultimate fact in question is
> purely a result of reasoning."  Id. at 391 n. 6.  A court always
> may consider the course of performance as evidence of the
> intent of the parties.  Atlantic Richfield Co. v. Razumic, 480
> Pa. 366, 390 A.2d 736, 741 n. 6 (Pa. 1978).

In re Old Summit Mfg., LLC, 523 F.3d 134, 137-38 (3d Cir. 2008).

One final aspect of contract interpretation should be mentioned.  Section 20

of the Restatement (Second) of Contracts, states, in pertinent part, that

> (2) The manifestations of the parties are operative in
> accordance with the meaning attached to them by one of the
> parties if
>
>> (a) that party does not know of any different
>> meaning attached by the other, and the other
>> knows the meaning attached by the first party;
>> or
>>
>> (b) that party has no reason to know of any
>> different meaning attached by the other, and the
>> other has reason to know the meaning attached
>> by the first party.

Restatement (Second) Contracts, §20 "Effect of Misunderstanding" (1981).

15

This principle, as originally espoused in the Restatement Contracts, § 71

(1932), has been cited approvingly by a Pennsylvania appellate court:

> The arbitrators could have based their finding that there was a
> valid contract on either of two grounds: (1) both parties may
> have attached the same meaning to Alternate #4; or (2) if
> appellee knew of the ambiguity and appellant did not, and
> appellee did nothig [sic] to clarify it although he knew that
> appellant might attach the other meaning to Alternate #4, he
> would be bound by appellant's interpretation.  Restat.
> Contracts, Sec. 71, Comment (a), particularly Illustration 1
> (1932).  Goddard v. Holland Transportation Co., 84 N.Y.S.2d
> 410 (Sup.1948), affirmed 277 App. Div. 755, 97 N.Y.S.2d
> 372.  See Restat. Contracts 2d (1964) Tentative Draft § 21A
> and the sources cited therein.

Framlau Corp. v. Upper Dublin School Authority Bd., 219 Pa. Super. 369, 372 (1971).

More recently, the Third Circuit stated that "it is a central principle of

contract interpretation that if a party knew or had reason to know of the other parties'

interpretation of terms of a contract, the first party should be bound by that

interpretation."  Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 99

(3d Cir. 2001); see also Emor, Inc. v. Cyprus Mines Corp., 467 F.2d 770, 775 (3d Cir.

1972) ("[T]he meaning given to the words by one party should be given effect if the other

party knew or had reason to know that it was in fact given.") (quoting 3 Corbin, On

Contracts § 537, at 51 (1960)).


IV.


With these principles in mind, I now turn to the two issues posed by the

parties: (1) whether Ms. Mayer is entitled to payment on her priority claim from funds

16

remaining in the trustee's possession; and (2) whether Ms. Mayer is entitled to object to

the trustee's final application for compensation.  I shall take them in reverse order.


A.


A trustee's right to compensation stems from 11 U.S.C. §§ 326 and 330.

This chapter 7 case commenced on October 14, 2005, just prior to the effective date of

most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act

of 2005 (BAPCPA).  Thus, the pre-BAPCPA version of section 330 is applicable to the

trustee's request for compensation.  See In re Lan Associates XI, L.P., 192 F.3d 109, 115

n.7 (3d Cir. 1999); In re Goucher, 378 B.R. 445, 447 (Bankr. M.D. Pa. 2007); In re

Holland, 374 B.R. 409 (Bankr. D. Mass. 2007).

Section 326 provides in relevant part for this contested matter:

(a) In a case under chapter 7 or 11, the court may allow
reasonable compensation under section 330 of this title of the
trustee for the trustee's services, payable after the trustee
renders such services, not to exceed 25 percent on the first
$5,000 or less, 10 percent on any amount in excess of $5,000
but not in excess of $50,000, 5 percent on any amount in
excess of $50,000 but not in excess of $1,000,000, and
reasonable compensation not to exceed 3 percent of such
moneys in excess of $1,000,000, upon all moneys disbursed
or turned over in the case by the trustee to parties in interest,
excluding the debtor, but including holders of secured claims.

Section 330(a), as pertinent, provides:

(a)(1) After notice to the parties in interest and the United
States Trustee and a hearing, and subject to sections 326, 328,
and 329, the court may award to a trustee, an examiner, or a
professional person employed under section 327 or 1103–

17

(A) reasonable compensation for actual,
necessary services rendered by the trustee,
examiner, professional person, or attorney and
by any paraprofessional person employed by
any such person; and

(B) reimbursement for actual, necessary
expenses.
***

3) In determining the amount of reasonable compensation to
be awarded, the court shall consider the nature, the extent, and
the value of such services, taking into account all relevant
factors, including–

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the
administration of, or beneficial at the time at
which the service was rendered toward the
completion of, a case under this title;

(D) whether the services were performed within
a reasonable amount of time commensurate with
the complexity, importance, and nature of the
problem, issue, or task addressed; and

(E) whether the compensation is reasonable
based on the customary compensation charged
by comparably skilled practitioners in cases
other than cases under this title.

In fixing compensation for a bankruptcy trustee, the Third Circuit Court of

Appeals has provided the following instructions:

Sections 326(a) and 330 of the Bankruptcy Code "control the
determination of the amount of compensation to be awarded
trustees appointed in a case under Chapter 7 or Chapter 11."
In re Biskup, 236 B.R. 332, 335 (Bankr. W.D. Pa. 1999).
Section 330 authorizes bankruptcy courts to award reasonable
compensation to trustees. . . .  Section 330's allowance of
reasonable compensation is subject to the maximum
percentages set forth in § 326(a). . . .  Courts have emphasized

18

> repeatedly that a trustee is not entitled to the maximum fee
> allowed under § 326(a); "[t]he maximum compensation
> allowable under § 326(a) is awarded to a . . . trustee only in
> cases in which the result obtained and the benefit realized by
> the estate are exemplary." Narragansett Clothing, 210 B.R. at
> 496; see also Biskup, 236 B.R. at 336 ("The language of §
> 326 is permissive rather than mandatory in that it fixes the
> maximum compensation of a trustee, and it is not to be
> construed as an entitlement to the maximum fee specified."); .
> . . . H.R. Rep. No. 95-595, at 329 (1978), reprinted in 1978
> U.S.C.C.A.N. 5963, 6286 ("Section 330 authorizes
> compensation for services and reimbursement of expenses of
> officers of the estate. . . . [T]he compensation allowable
> under this section is subject to the maxima set out in section[ ]
> 326.").

In re Lan Associates XI, L.P., 192 F.3d at 115-16 (footnote and citations omitted).

Pursuant to section 326(a), computation of the statutory ceiling for trustee

compensation is based upon "cash or its equivalent which the trustee actually disburses to

parties in interest." Id., at 119. Ms. Mayer asserts that:

> the $5,000,000 surrendered by the Trustee to Deans and
> Mayer were not disbursements to "parties in interest". The
> $5,000,000 represented property returned to its rightful
> owner(s) that was not property of the [bankruptcy] estate.

Mayer Objection, at 3 (citations omitted).

In other words, Ms. Mayer maintains that the PMA sale proceeds

distributed by the trustee to herself and to Ms. Deans, which total $5,000,000 ($3,875,000

plus $1,1,25,000), should be considered as a return of their own property rather than

property of the bankruptcy estate, and thus excluded from the statutory ceiling established

by section 326(a). See generally In re Market Resources Development Corp., 320 B.R.

841, 847 (Bankr. E.D. Va. 2004):

> [F]or purposes of § 326(a), the phrase "moneys disbursed or
> turned over in the case by the trustee to parties in interest"
> requires several elements:

19

\*\*\*

3. The money must be property of the estate.  "[T]he base will exclude property (or monies attributable to such property) returned to a third party after a determination (whether by agreement of the parties or by court order) (a) that the property in question came into the hands of the estate by means of fraud or illegality or (b) that the property is not property of the estate and should be returned to its rightful owner(s)."  Citi-Toledo Partners II at 161; North American Oil & Gas at 478.

See also Collier Handbook For Trustees and Debtors in Possession, ¶ 9.02 (1997) ("Compensation [historically] was directly tied to the trustee's success in bringing property into the estate, liquidating that property and distributing the proceeds to creditors.").

In addition, Ms. Mayer argues in her objection that "the amount requested [by the trustee in his final application] does not represent reasonable compensation for actual, necessary services rendered."  Mayer Objection, at 4.

The trustee in the present contested matter asserts that the parties intended for all of the PMA sale proceeds paid to him by Ms. Deans to be considered part of the bankruptcy estate, and that any objection to the reasonableness of his present fee request was waived by Ms. Mayer as a component of the March 2007 settlement.  He relies upon the language of paragraph (f):

The Trustee shall be entitled to his statutory commission but has agreed that in no event will he receive more than $175,000.00 commission related to the recovery of the Settlement Payment.

In so doing, the trustee emphasizes the use of the word "entitled," as well as the compromise represented by the amount mentioned: $175,000.

20

Ms. Mayer essentially asserts two arguments in support of her interpretation of the settlement agreement that would allow her to object to the trustee's final application for compensation request.  First, she notes that paragraph (f) of that agreement does not explicitly prohibit such an objection; and given the presence of  language in paragraph (i) stating that the trustee had no right to object to the unsecured claims provided therein to Ms. Deans and Ms. Mayer, the absence of similar language in paragraph (f) is reflective of the parties' intention.  Second, Ms. Mayer contends that the $175,000 amount in paragraph (f) was intended only as a ceiling upon the trustee's commission, which ceiling actually exceeded that permitted by section 326(a) (for reasons noted above, given her interpretation of the scope of the bankruptcy estate).

 For the following reasons, I find the trustee's position that Ms. Mayer agreed in March 2007 not to object to the trustee's compensation, if limited to $175,000, more persuasive than Ms. Mayer's argument that there was no such accord.

Under the trustee's interpretation of the March 2007 settlement agreement, he was to distribute about $7 million, all of which was to be treated as property of the bankruptcy estate for purposes of section 326(a).  If so, his commission ceiling would have been about $233,000.  By virtue of paragraph (f), he agreed to reduce his compensation to $175,000 in order to help fund a distribution to general unsecured creditors.

Ms. Mayer's interpretation is that the parties intended that $5 million of the funds held by Ms. Deans would not be considered estate property.  If so, then the $175,000 amount mentioned in paragraph (f) is meaningless, as the commission ceiling imposed by section 326(a) on trustee distributions of about $2 million would be only

$83,250.  Given the intention of the trustee to provide some dividend to unsecured

creditors, construing the $175,000 amount as a compensation reduction is an

"interpretation which under all circumstances ascribes the most reasonable, probable, and

natural conduct of the parties, bearing in mind the objects manifestly to be

accomplished." Charles D. Stein Revocable Trust v. General Felt Industries, Inc., 749

A.2d 978, 980 (Pa. Super. 2000).

     Other terms of the settlement agreement further support this result.

Paragraph (a) required Ms. Deans to turn over all $7 million of the PMA sale proceeds in

her possession to the trustee, referred to as the "settlement payment."  If the parties

intended that only $2 million be treated as estate property to be distributed by the trustee,

it is more likely that the settlement would have provided for Ms. Deans to retain her own

distribution under paragraph (b), pay Ms. Mayer her agreed amount directly under

paragraph (c), and tender only $2 million to the trustee.  Furthermore, paragraph (d)

required that the trustee pay the tax obligation arising on the entire "settlement payment."

Such a trustee tax liability would only arise from administration of property of the

bankruptcy estate.  See In re Card, 114 B.R. 226, 228 (Bankr. N.D. Cal. 1990) ("Higher

courts ruled that a liquidating trustee in bankruptcy is in fact liable for capital gains tax on

the sale of estate assets."); see generally  S. Rep. No. 95-989, 95th Cong., 2d Sess. 66

(1978) ("In general, administrative expenses include taxes which the trustee incurs in

administering the debtor's estate, including taxes on capital gains from sales of property

by the trustee and taxes on income earned by the estate during the case.").

     I also note that paragraph (e) provides that the trustee's bankruptcy counsel

is "entitled to receive a fee equal to 30-40% of the Settlement Payment pursuant to the

22

provisions of the Employment Order dated October 18, 2006." Bankruptcy counsel, however, agreed to limit its compensation to no more than $500,000. The October 2006 engagement order referred to allowed for a contingency fee upon the "net recovery of funds collected" by the trustee. Thus, paragraph (f), along with the others just mentioned, equates the $7 million "settlement payment" with assets collected by the trustee: i.e., estate property.

In addition, paragraphs (a), (b), and (c) all refer to "distributions" to be made by the trustee pursuant to the settlement agreement. The most logical interpretation of the term yields an intent by the parties for these distributions to be viewed as disbursements under 11 U.S.C. § 326(a). Indeed, Ms. Deans so agrees and Ms. Mayer's counsel conceded that he understood the trustee to have so intended in executing this agreement. If Ms. Mayer intended otherwise, that should have been communicated to the trustee when the settlement agreement was being negotiated. See, e.g., Framlau Corp. v. Upper Dublin School Authority Board, 219 Pa. Super. 369, 372 (1971).

In other words, in reviewing all of the terms of the settlement agreement in a consistent manner, the most reasonable and probable interpretation is that the parties intended that the entire $7 million settlement payment be treated as estate property to be distributed by the chapter 7 trustee. Alternatively, if the March 2007 settlement were ambiguous, the evidence presented as to the purpose of those aspects of the agreement and Ms. Mayer's knowledge, through her attorney, of that unchallenged purpose, yields a similar result.

Accordingly, Ms. Mayer, in signing the March 2007 accord, consented to the trustee's treatment of the settlement payment as property of the estate. Therefore, I

23

agree with the trustee that she cannot recant that agreement in objecting to the trustee's compensation by now arguing that only a small fraction of the settlement payment should be considered estate property for purposes of the ceiling established by section 326(a).

B.

As noted earlier, a bankruptcy trustee's allowed compensation must not exceed the section 362(a) ceiling, but must also be reasonable under section 330(a).  See In re Lan Associates XI, L.P.  Ms. Mayer's objection contends that $175,000 is unreasonable for the services rendered by the trustee in this chapter 7 case.  The trustee responds that Ms. Mayer agreed not to raise such an objection (as well as the aforementioned issue under section 326(a)).

Again, paragraph (f) stated: "The Trustee shall be entitled to his statutory commission but has agreed that in no event will he receive more than $175,000.00 commission related to the recovery of the Settlement Payment."  In support of his waiver argument against Ms. Mayer on the question of reasonableness, the trustee emphasizes that this provision contains the word "entitled," as well as the fact that $175,000 represented a concession by the trustee to limit his permissible compensation.

I agree that the inclusion of the word "entitled" does support the trustee's understanding that, in return for his compromise of the ceiling amount, the other parties to the settlement agreement (Ms. Mayer and Ms. Deans) would not seek any further reductions.  See generally DeGeorge v. Young, 892 A.2d 48, 52 (Pa. Cmwlth. 2006) ("The trial court appropriately turned to Black's Law Dictionary for guidance in defining

24

the term 'entitle,' which means '[t]o grant a legal right to or qualify for.' Black's Law

Dictionary 573 (8th ed. 2004).")); In re Mondal's Estate, 41 Pa. D. & C.2d 570, 574 (Pa.

Orph. 1967) ("Our research has failed to disclose any decisions in which this word has

been defined by a Pennsylvania court except Commonwealth v. Moorhead, 7 Pa. C. C.

513, 517 (1890), in which the late Judge Endlich, who was one of the State's most

respected and erudite jurists, said: 'Entitled is a strong word, and signifies a claim or

right: Conoly v. Gayle, 54 Ala. 269.'"); Compare Jordan v. Michigan Conference of

Teamsters Welfare Fund, 2000 WL 33321350, at *1 (E.D. Mich. 2000) (settlement

agreement provided: "Counsel for Plaintiffs shall be entitled to seek and receive an award

of reasonable attorney fees from defendant MCTWF to be determined by the Court. . . .

Nothing in this paragraph shall be deemed a waiver of any right of any Settling Party or

participant/ beneficiary to object to the reasonableness of the fees."). Otherwise, the

trustee would receive no entitlement.

Moreover, the phrase "entitled to his statutory commission" provides

further support for the trustee's contention.

Section 330(a) of the Bankruptcy Code was amended effective October 17,

2005 to add the following provision:

> (7) In determining the amount of reasonable compensation to
> be awarded to a trustee, the court shall treat such
> compensation as a commission, based on section 326.

11 U.S.C. § 330(a)(7). Prior to the enactment of this provision, the Bankruptcy Code did

not use the word "commission" in connection with a bankruptcy trustee's compensation.

In addition to the addition of section 330(a)(7), the BAPCPA amendments

modified section 330(a)(3). It now reads:

25

> In determining the amount of reasonable compensation to be awarded <u>to an examiner, trustee under chapter 11, or professional person</u>, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including--

The underlined clause was added.  And this clause makes reference only to trustees serving in chapter 11 cases.  As a result of these two amendments, one commentator observed:

> The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended section 330(a)(3) to provide that the five listed factors to be used "[i]n determining the amount of reasonable compensation" expressly apply to "an examiner, trustee under chapter 11, or professional person[.]" . . . .
>
> Under prior law, the listed factors applied to all awards of compensation under section 330.  The amendment has one notable effect.  While a chapter 11 trustee's reasonable compensation is to be determined "taking into account" the listed factors, those factors are no longer expressly applicable to trustees appointed in cases under chapter 7, chapter 12 or chapter 13.
>
> The 2005 amendment also changed the standard for determining the compensation of a trustee.  New section 330(a)(7) provides that "[in] determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326."  Section 326 limits the compensation of trustees under chapter 7 and 11 cases to a percentage of moneys distributed, and of trustees chapter 12 and 13 cases to a percentage of payments made under a plan.
>
> Under prior law, a trustee was entitled to reasonable compensation, and was limited by the percentage formulae in section 326.  Courts had generally applied the same standard to trustees in business cases as they have to counsel for a trustee—the application contained a detailed daily summary of the trustee's activities, and a narrative description explaining what was accomplished in the case and the trustee's role in those accomplishments.  The purpose of the description and narrative was to demonstrate a "reasonable" fee as required by section 330.  As originally enacted, the

26

> percentage formulae in section 326 were intended to serve as
> an upper limit on a trustee's fee.
>
> New section 330(a)(7) changes current law by providing that
> the compensation of a trustee is to be treated as a commission,
> based on the formulae in section 326(a).  <u>The primary effect
> of the change should be that, in the majority of cases, a
> trustee's allowed fee will presumptively be the statutory
> commission amount.</u>

3 <u>Collier on Bankruptcy</u>, ¶ 330.03[1][a] (15th ed. rev. 2009) (footnotes omitted)

(emphasis added).

As noted earlier, this chapter 7 case predates the BAPCPA amendments to section 330(a).  Therefore, I need not now determine whether Congress intended to alter the traditional method to fix compensation of chapter 7 trustees by presumptively using the percentages established in section 326(a) as a "statutory commission."  But the current chapter 7 trustee, Mr. Seitz, is also a trustee in bankruptcy cases governed by the BAPCPA amendments.   He certainly would have been familiar with compensation issues raised by the BAPCPA amendments to section 330.  Thus, the use of the phrase "entitled to his statutory commission" found in paragraph (f) of the settlement agreement most likely was a reference to current section 330(a)(7), and was intended to foreclose the settling parties from raising questions of the reasonableness of his compensation so long as the trustee limited his compensation request to the compromise section 326(a) ceiling.

That does not mean that other parties in interest, <u>i.e.</u>, the United States trustee, other creditors, or this court <u>sua</u> <u>sponte</u>, <u>see</u> <u>In re Busy Beaver Building Centers, Inc.</u>, 19 F.3d 833 (3d Cir. 1994), could not challenge the reasonableness of the commission sought by the trustee.  However, I agree with the trustee that Ms. Mayer

cannot object to the trustee's commission on the grounds that the amount sought, as

specified in paragraph (f), is unreasonable, consistent with her settlement.[7]


C.


Finally, the trustee argues that paragraph (i) of the March 2007 settlement

agreement limits Ms. Mayer to now holding only a partially subordinated $7,500,000

general unsecured claim, after she received her $3,875,000 distribution as provided in

paragraph (c).  He reasons that to conclude otherwise would render meaningless the

provision of paragraph (i) establishing that other unsecured creditors would receive a

10% dividend, since Ms. Mayer's $15,300,000 priority claim would preclude such a

dividend.

Ms. Mayer counters that paragraph (i) (and the rest of the settlement

agreement) contain no waiver of any priority claim.  Indeed, she emphasizes that

paragraph (i) begins with the sentence: "All remaining funds [after the distributions in

paragraphs (b) and (c)] shall be distributed by the Trustee in accordance with the

distribution scheme set forth in the Bankruptcy Code."  As Ms. Mayer had filed a proof of

claim asserting priority status under section 507(a), if the parties had intended any waiver

by her then their settlement would have so stated.

---

[7]As will be discussed below, this settlement agreement was limited to resolving
issues arising from the PMA settlement proceeds.  Thus, Ms. Mayer retained the right to object to
the trustee's compensation to the extent it is based upon non-settlement distributions of estate
property.  Here, however, while there will be small distributions from non-settlement funds, the
trustee seeks no fee founded upon them.

For a number of reasons, I find the trustee's interpretation of the March 2007 settlement agreement more reflective of the parties' intentions.

First, it is clear that this settlement was intended to resolve all possible disputes over the disposition of the PMA sale proceeds that could involve the trustee, Ms. Deans and/or Ms. Mayer.  Consistent with such intent, the parties agreed to fix in paragraph (i) the amount of the post-distribution claims held by Ms. Deans and Ms. Mayer, as well as their status as general unsecured creditors, with the trustee promising not to contest such claims.  However, if Ms. Mayer's interpretation of the settlement agreement were correct, the issue of her priority claim status and the amount of such priority would be open to future litigation.

Second, if Ms. Mayer were permitted to assert a challengeable priority claim as to the PMA settlement proceeds, such priority could indeed nullify the provisions providing a 10% dividend to unsecured creditors other than Ms. Deans or Ms. Mayer, and also render Ms. Deans' subordinated unsecured claim meaningless.  Under Pennsylvania law, when "determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect. . . .  Thus, we will not interpret one provision of a contract in a manner which results in another portion being annulled."  LJL Trasnportation, Inc. v. Pilot Air Freight, Corp., 599 Pa. 546, 559-60 (2009); see, e.g., Cerceo v. De Marco, 391 Pa. 157, 162 (1958).

Third, the promise of a 10% dividend to general unsecured creditors, along with a partially subordinated unsecured claim for Ms. Deans, was clearly a factor in the willingness of Ms. Deans and the trustee to enter into the March 2007 settlement with Ms. Mayer, as well as in the granting of concessions by the trustee and trustee's counsel

29

regarding their compensation from the PMA sale proceeds.  It may also have been a factor in Weir & Partners withdrawing its opposition to the settlement.

Fourth, the provisions of the settlement agreement, including those of paragraph (i), state that their terms "shall apply only to the distribution of the remaining portion of the Settlement Payment and not to any other assets that may be recovered by the Trustee."  As noted earlier, Ms. Mayer was asserting in March 2007, and the other parties may have anticipated, that the trustee would recover additional assets from the debtor.  The language of the settlement agreement thus reflects an intention that Ms. Mayer could assert her priority claim as to the proceeds of those non-PMA settlement proceeds, and the trustee could object thereto.  Accordingly, there would be no understanding that Ms. Mayer withdrew her priority claim by virtue of the March 2007 accord; only that she not assert that claim against the settlement payment made to the trustee.[8]

Fifth, in my memorandum approving the March 2007 settlement, I analyzed the reasonableness of the proposed settlement agreement based upon Ms. Mayer holding only a partially subordinated general unsecured claim as to the undistributed portion of the settlement payment.  Neither she nor any other party seeking approval of that agreement offered evidence or argument that the distribution provisions of paragraph (i) would be primed by her priority claim.

Finally, to the extent that paragraph (i) of the settlement agreement is considered ambiguous, I find credible the testimony offered by the trustee and Ms. Deans

---

[8]Thus, as to the limited non-settlement proceeds to be distributed by the trustee in this case, Ms. Mayer's priority claim is unaffected.

that they negotiated the provisions of paragraph (i) and entered into this settlement in the belief that Ms. Mayer would not assert any priority claim against the undistributed PMA sale proceeds remaining in the trustee's possession.  Such a belief should have been readily apparent to her (through her counsel).  If she intended otherwise, she should have so informed them at that time.  See Framlau Corp. v. Upper Dublin School Authority Bd., 219 Pa. Super. 369, 372 (1971).

Accordingly, although I agree that Ms. Mayer never agreed to withdraw her priority claim in this chapter 7 case, she did agree not to assert such a claim against the PMA sale proceeds that were the subject of the March 2007 settlement agreement, and is now precluded from doing so.

V.

In conclusion, based upon the language of the March 2007 settlement approved by this court, I shall strike the objection of Ms. Mayer as to the trustee's final fee application.  Furthermore, I have determined that the chapter 7 trustee, in preparing his final distribution report, need not consider Ms. Mayer's priority claim, but only as to the PMA settlement proceeds remaining in his possession.[9]  Those funds held by the chapter 7 trustee that are not derived from the settlement proceeds can be distributed to Ms. Mayer on a priority basis (unless her priority claim is disallowed upon future objection).

---

[9]Given Ms. Mayer's large allowed unsecured claim in paragraph (i), it appears that she will still receive the majority of the final distribution made to creditors, even though her priority claim will be limited, as set out above.

31

An appropriate order shall be entered.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: July 6, 2009